<u>**Exhibit B**</u>

**Revised Disclosure Statement**

K&E 23288713

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| UNITED RETAIL GROUP, INC., *et al.*,[1] | ) Case No. 12-10405 (SMB) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

Paul M. Basta
Marc Kieselstein, P.C.
Nicole L. Greenblatt
Benjamin J. Steele
Joseph A. Pack
**KIRKLAND & ELLIS LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900

*Counsel to the Debtors*
*and Debtors in Possession*

Dated:  July [23], 2012

---

**THIS DISCLOSURE STATEMENT IS SUBJECT TO BANKRUPTCY COURT APPROVAL AND IS NOT SUBMITTED IN SOLICITATION OF VOTES IN FAVOR OF THE DEBTORS' CHAPTER 11 PLAN.**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: United Retail Group, Inc. (3670); Avenue Gift Cards, Inc. (5281); United Distribution Services, Inc. (8531); United Retail Holding Corporation (1251); United Retail Incorporated (5670); and United Retail Logistics Operations Incorporated (5672).  The Debtors' main corporate address is 365 West Passaic Street, Rochelle Park, New Jersey 07662.

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS SEPTEMBER [4], 2012, AT 4:00 P.M. EASTERN TIME. THE NOTICE AND CLAIMS AGENT MUST ACTUALLY RECEIVE YOUR BALLOT BEFORE THE VOTING DEADLINE.**

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN OF LIQUIDATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE TO HOLDERS OF CLASS 2—SECURED CLAIMS AND CLASS 3—GENERAL UNSECURED CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS. THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THIS DISCLOSURE STATEMENT. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "ANTICIPATE," "CONTINUE," "ESTIMATE," "EXPECT," "MAY" OR "PROJECT," OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY. YOU ARE CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THAT THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS. THE INFORMATION CONTAINED HEREIN AND ATTACHED HERETO IS AN ESTIMATE ONLY, BASED UPON INFORMATION CURRENTLY AVAILABLE TO THE DEBTORS.

K&E 22996029

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.   PARTIES MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE.   ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.   IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.   THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS HAVE REVIEWED THE INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT.   ALTHOUGH THE DEBTORS HAVE USED THEIR REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS INFORMATION, THE INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THIS DISCLOSURE STATEMENT HAS NOT BEEN AUDITED.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT.   THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE

K&E 22996029

**DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

**BEFORE DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLASS 2—SECURED CLAIM AND CLASS 3—GENERAL UNSECURED CLAIM SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL IN ARTICLE VI BELOW, "RISK FACTORS."**

4

## I.    INTRODUCTION AND EXECUTIVE SUMMARY

### A.    PURPOSE OF THE DISCLOSURE STATEMENT

On February 1, 2012 (the "***Petition Date***"), the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code[2] in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***").  On February 3, 2012, the Bankruptcy Court entered an order [Docket No. 44][3] jointly administering the Chapter 11 Cases of United Retail Group, Inc.; Avenue Gift Cards, Inc.; United Distribution Services, Inc.; United Retail Holding Corporation; United Retail Incorporated and United Retail Logistics Operations Incorporated pursuant to Bankruptcy Rule 1015(b) under the lead case: *In re United Retail Group, Inc.*, Case No. 12-10405 (SMB).  The Debtors are managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On February 9, 2012, the United States Trustee for the Southern District of New York (the "***U.S. Trustee***") appointed an official committee of unsecured creditors (the "***Committee***") pursuant to section 1102 of the Bankruptcy Code [Docket No. 117].

The Debtors submit this disclosure statement (as amended, modified or supplemented, the "***Disclosure Statement***") pursuant to section 1125 of the Bankruptcy Code for purposes of soliciting votes to accept or reject the Plan, a copy of which is attached to this Disclosure Statement as **Exhibit A**.  The Plan has been filed with the Bankruptcy Court and the summaries of the Plan contained herein shall not be relied upon for any purpose other than to make a judgment with respect to, and determine how to vote on, the Plan.

Notice of this Disclosure Statement is being provided by the Debtors to the U.S. Trustee, the Committee and to all of the Debtors' known creditors and interest holders.  By Order dated July [24], 2012 [Docket No. __], the Disclosure Statement was approved by the Bankruptcy Court as containing "adequate information" under section 1125 of the Bankruptcy Code (the "***Disclosure Statement Order***").  The deadline to object to Plan Confirmation is **September [4], 2012 at 4:00 p.m. Eastern Time**.  A hearing to consider confirmation of the Plan is scheduled to be held before the Bankruptcy Court on **September [13], 2012 at [10:00] a.m. Eastern Time**.

### B.    SUMMARY OF SOURCES AND USES OF CONSIDERATION FOR PLAN DISTRIBUTIONS

#### i.    Consideration Provided Under the APA

As set forth in detail in Article II.E of this Disclosure Statement, on April 13, 2012, the Debtors closed the sale of substantially all of their assets to Avenue Stores, LLC (the "***Buyer***"),

---

[2]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Joint Plan of Liquidation Pursuant to Chapter 11 of the Bankruptcy Code* (the "***Plan***").

[3]    Unless otherwise noted, docket references correspond to the docket of United Retail Group, Inc.'s chapter 11 case.

an affiliate of Versa Capital Management, LLC ("**Versa**"). The APA with the Buyer provides for the following consideration to be distributed to the Debtors' creditors:[4]

- up to $27 million in the aggregate for (1) amounts outstanding under the DIP Facility as of the Closing[5] and (2) Administrative Claims (not including 503(b)(9) Claims, which are accounted for separately under the APA) and Priority Claims as of the Closing that ultimately are Allowed;

- up to $4.7 million for Allowed 503(b)(9) Claims;[6]

- $1.5 million (or such greater amount as shall equal 20% of the amount by which the aggregate of (1) amounts outstanding under the DIP Facility and (2) Administrative Claims and Priority Claims, in each case as of the Closing, is less than $27 million) for the benefit of holders of Allowed General Unsecured Claims on account of such Claims;[7] and

- up to $2 million for costs associated with winding down the Debtors' estates.

In addition, subject to certain limited exclusions set forth in the APA, the Buyer is responsible for all post-Closing operational expenses directly related to (i) the Debtors' former stores with respect to which the underlying leases have not yet been assumed or rejected until

---

[4]    Versa backstopped the Buyer's obligations under the APA with a $13 million equity commitment to the Buyer, which was paid at the Closing, and a $35 million guaranty of certain of the Buyer's monetary obligations under the APA.

[5]    There were no outstanding funded obligations under the DIP Facility as of the Closing. At the Closing, in connection with the DIP Facility, $500,000 was paid to Wells Fargo for financing fees and $85,000 was paid to Wells Fargo's counsel. These amounts were counted against the $27 million combined cap for pre-Closing DIP Facility, Administrative and Priority Claims.

[6]    The Debtors estimate that aggregate 503(b)(9) Claims will be no more than approximately $2.9 million.

[7]    The APA originally provided for payment of $500,000 to holders of Allowed General Unsecured Claims on account of such Claims. In connection with the settlement of an adversary proceeding brought by the Committee against the Buyer (as further described in Article II.G of this Disclosure Statement), the APA was amended to provide that holders of Allowed General Unsecured Claims would receive the greater of (a) $1.5 million and (b) 20% of the amount by which the aggregate of (i) amounts outstanding under the DIP Facility and (ii) administrative and priority claims, in each case as of the Closing, were less than $27 million. *See Stipulation and Agreement of Settlement Among the Debtors, Redcats USA, Inc., the Official Committee of Unsecured Creditors and Ornatus URG Acquisition LLC* [Adv. Proc. No. 12-01165, Docket No. 15] (the "**Committee Stipulation**"). Thus, if the aggregate of amounts outstanding under the DIP Facility and administrative and priority claims as of the Closing was greater than $19.5 million, the Buyer would fund $1.5 million for the benefit of holders of Allowed General Unsecured Claims, and if the aggregate of amounts outstanding under the DIP Facility and administrative and priority claims as of the Closing was less than $19.5 million, the Buyer's contribution would increase accordingly to equal 20% of the amount by which such aggregate was less than $27 million. As of the Closing, the aggregate of amounts outstanding under DIP Facility and administrative and priority claims was estimated to be approximately $19.96 million, and the Buyer funded $1.5 million into escrow. To the extent post-Closing reconciliations performed up until the Effective Date demonstrate that these claims were less than $19.5 million as of the Closing, the Buyer will fund any shortfall on the Effective Date pursuant to the Committee Stipulation.

such time as such assumption or rejection is effective, including costs associated with going-out-of-business sales for non-continuing stores, (ii) contracts in existence post-Closing that have not yet been assumed or rejected until such time as such assumption or rejection is effective and (iii) the cost of any supervisory employees of the Debtors employed on a temporary post-Closing basis. These expenses will be paid directly by the Buyer in the ordinary course of business, and the Buyer's obligations for such post-Closing operating expenses are uncapped, which should eliminate most if not all post-Closing claims entitled to administrative priority, other than claims for professional fees and U.S. Trustee fees, which fees are expected to be contained within the $2 million wind-down expenses for which the Buyer is responsible.[8] For a further discussion regarding the $2 million wind-down budget, please see the ***Risk Factors*** at Article VI.A.viii of this Disclosure Statement.

The Claims caps and other Buyer obligations included in the APA were developed after significant analysis by the Debtors' management and advisors, were heavily negotiated with the Buyer and reflect the maximum recoveries available to these estates following a thorough marketing process. The Debtors believe the buckets of consideration contemplated by the APA (and enhanced pursuant to subsequent agreements described herein) should be sufficient to satisfy all Claims against the Debtors' estates. Based upon post-Closing reconciliations conducted through the date hereof, which are substantially complete, the Debtors believe total Administrative and Priority Claims as of the Closing were approximately $16.3 million—an estimated $10.7 million under the $27 million cap. Of the $27 million cap for Administrative Claims and Priority Claims as of the Closing, such claims were estimated on July 17, 2012 to be approximately $16.3 million.[9] These Claims generally were for day-to-day operating expenses of the Debtors' former business and have already been satisfied in the ordinary course, with the exception of $4.192 million that was funded into escrow at the Closing to pay for accrued but unpaid professional fees as of the Closing.[10] To the extent that allowed professional fees as of the Closing ultimately are less than $4.192 million, the remainder of the escrow may be used to pay other Administrative Claims required to be paid under the APA up to the $27 million cap. The Debtors expect that the approximately $10.7 million remaining under the $27 million cap will be sufficient to pay any Administrative and Priority Claims as of the Closing that are currently unknown or unliquidated.[11] Post-Closing liabilities generally will be satisfied from one

---

[8]    The post-Closing fees and expenses of the Plan Administrator, which were negotiated heavily by the Debtors' Board of Directors, are capped at $1 million.

[9]    Although the Debtors have completed reconciling the vast majority of these Claims, certain Priority Claims remain unliquidated or undetermined, including certain operating expenses, property taxes, and employee-related costs, and the Debtors have not established an Administrative Claim bar date outside what is contemplated by the Plan. Therefore, the current $16.3 million estimate for Administrative Claims and Priority Claims as of the Closing may increase.

[10]    The Debtors have disbursed approximately $3.185 million from the professional fee escrow to date. The Debtors expect to disburse approximately $450,000 in additional professional fee payments from the escrow, leaving approximately $558,000 to be returned to the Buyer or used to pay other Administrative Claims pursuant to the APA.

[11]    Moreover, pursuant to the Committee Stipulation, to the extent that the aggregate of amounts outstanding under the DIP Facility and Administrative and Priority Claims as of the Closing was less than $19.5 million in the

of two sources: the $2 million for wind-down costs of the Debtors' estates or the Buyer's uncapped commitment to fund post-Closing operating expenses of the Debtors as described above.

Moreover, although the APA generally contemplates that allowed claim amounts will be paid by the Buyer as and when due (with the exception of the $1.5 million reserve for the benefit of unsecured creditors that will be included in the Unsecured Claims Funds (subject to increase on the Effective Date as set forth herein), which payment was made as of the Closing and currently is held in escrow by Cooley LLP, counsel to the Committee), the Debtors are mindful of the plan confirmation requirements under section 1129 of the Bankruptcy Code and, accordingly, the Debtors have drafted the Plan to provide creditors with greater certainty of payment.  Toward that end, the Plan establishes "***Reserves***" to be funded on the Effective Date in accordance with Article VI.C.2 of the Plan and then used by the Plan Administrator to pay Allowed Claims, as follows:

- Article VI.C.2 of the Plan provides that, before the Effective Date, the Debtors will determine, after consultation with and the reasonable consent of the Buyer, an estimate of the maximum aggregate amount needed to fund the Reserves—the ***Reserves Estimate***. The Reserves Estimate will be calculated by taking into account the caps set forth in the APA that are described above, the Buyer's obligation to pay ongoing operating expenses of the Debtors' former business after the Closing and any unused portion of the $4.192 million that was funded into escrow at the Closing to pay for accrued but unpaid professional fees as of the Closing;

- Thereafter, the Buyer shall determine in its sole and absolute discretion the amount of each of the Reserves that it will fund—the ***Buyer Reserve Contribution***.  The Buyer Reserve Contribution shall be no less than the lesser of (i) 90% of Buyer's then remaining obligations under the APA that relate to any of the Reserves categories and (ii) $100,000.

It is a condition precedent to the effectiveness of the Plan that sufficient cash to fund the Reserves in an amount no less than the Reserves Estimate shall be available, including any Buyer Reserve Contribution that the Buyer has notified the Debtors that it intends to fund, subject to the effectiveness of the Plan.  Any amounts left in the Reserves after all Allowed Claims have been paid pursuant to the Plan will be returned to the Buyer, unless any cash has been sourced other than from the Buyer, in which case it will be allocated pro rata in accordance with the relative contributions.  In no event shall the Buyer have an obligation to fund any amounts in excess of amounts required to be paid by the Buyer pursuant to the APA.

ii.      **Recoveries for General Unsecured Claims: The Redcats/Committee
Settlement and the Redcats Unsecured Claims Contribution**

The Debtors are very pleased that following a comprehensive marketing process resulting in the sale of substantially all of the Debtors' assets to the Buyer, and as a result of extensive

---

aggregate, the Buyer's contribution to the Unsecured Claims Funds will increase accordingly to equal 20% of the amount by which such aggregate was less than $27 million.

K&E 22996029

good faith negotiations throughout these Chapter 11 Cases among the Debtors, the Buyer, Redcats and the Committee, the Plan incorporates certain compromises and additional consideration to unsecured creditors that maximize recoveries for holders of Allowed General Unsecured Claims.

Specifically, as noted above and discussed further herein, the APA originally provided for the Buyer to fund a cash reserve of $500,000 for the benefit of holders of Allowed General Unsecured Claims. In connection with the Committee Stipulation approved on March 20, 2012 [Adv. Proc. No. 12-01165, Docket No. 15], the total consideration paid by the Buyer for the benefit of holders of Allowed General Unsecured Claims increased from $500,000 to a minimum of $1.5 million.[12] That amount was funded into escrow at the Closing and comprises one piece of the Unsecured Claims Funds allocable to holders of Allowed General Unsecured Claims under the Plan.

As a result of a further settlement among the Committee and Redcats, the Plan contemplates that Redcats will contribute an additional $1.25 million of consideration to the Unsecured Claims Funds —— the **Redcats Unsecured Claims Contribution**. Redcats' agreement to provide the Redcats Unsecured Claims Contribution is part of an overall settlement among Redcats and the Committee, which was reached after extensive, good-faith negotiations facilitated by the Debtors, and which includes the following:

- Contribution by Redcats of an additional $1.25 million in Cash for the benefit of unsecured creditors;

- Redcats' agreement to waive any recovery on account of General Unsecured Claims asserted in certain proofs of claim filed against the Debtors, which Claims were asserted in excess of $2 million — the **Waived Redcats Unsecured Claims**; and

- The Committee's agreement to support the release and exculpation provisions of the Plan, including the release of Redcats by the Debtors, the Committee and holders of Claims who vote to accept the Plan.

The terms of the settlement, which are reflected in the Plan, (i) resolve the Committee's ongoing investigation of potential causes of action against Redcats, including all related discovery disputes and motion practice and (ii) significantly enhance projected recoveries to holders of Allowed General Unsecured Claims by (a) increasing the total cash available for distribution to such holders to $2.75 million and (b) reducing the total pool of Allowed General Unsecured Claims through elimination of the Waived Redcats Unsecured Claims.

---

[12]  As noted above, pursuant to the Committee Stipulation, the APA provides that the Buyer contribute for the benefit of holders of Allowed General Unsecured Claims an amount equal to the greater of (a) $1.5 million and (b) 20% of the amount by which the aggregate of (i) amounts outstanding under the DIP Facility and (ii) administrative and priority claims, in each case as of the Closing, were less than $27 million. Although the Buyer funded $1.5 million at the Closing, to the extent (b)(i) and (ii) above are less than $19.5 million in the aggregate as a result of reconciliations made through the Effective Date, the Buyer will increase its contribution to the Unsecured Claims Funds to the extent of such shortfall.

9

As a result of the APA and the settlement with Redcats, the Plan contemplates that holders of Allowed Class 3 General Unsecured Claims will receive their pro rata share of Net Available Funds, which includes the $2.75 million in Unsecured Claims Funds plus the proceeds, if any, of other asset sales or recoveries that may be made available to the Debtors' estates, less any amount of Cash needed to fund Reserve shortfalls for higher priority claims.

The Debtors will make distributions to holders of Allowed Class 3 General Unsecured Claims as soon as practicable after the Effective Date, which distributions may be made on multiple distribution dates.   Distributions to Class 3 creditors are subject to the following conditions under the Plan:[13]

- No distributions will be made to holders of Allowed Class 3 General Unsecured Claims until Cash sufficient to pay all higher priority claims and Disputed General Unsecured Claims are deposited into the applicable reserves in accordance with the Plan; and

- A final distribution will not be made until after (a) the liquidation into Cash of all remaining Assets (other than any assets abandoned by the Debtors) and collection of other sums due or otherwise remitted or returned to the Debtors, and (b) all Cash in the Reserves has been distributed or returned to the Buyer in accordance with Article V.L of the Plan.

*Although the Plan contemplates that $2.75 million in Unsecured Claims Funds will be distributed to holders of Allowed Class 3 General Unsecured Claims as soon as is practicable after the Effective Date, the Debtors cannot state with certainty what recovery will ultimately be available to holders of Claims in Class 3.*   Specifically, the Debtors cannot know with certainty, at this time, the aggregate amount of Claims in Class 3 that will ultimately be Allowed or whether certain funds currently designated for distribution to Class 3 will need to be allocated to shortfalls in the Reserves for Claims with higher priority and first right to payment under the Bankruptcy Code.

The priority scheme in sections 503 and 507 of the Bankruptcy Code and the confirmation requirements set forth in section 1129 of the Bankruptcy Code mandate that Administrative Claims and Professional Fee Claims be paid in full before any distribution can be made to holders of Allowed Class 3 General Unsecured Claims.   The Debtors are operating under a limited $2 million wind-down budget pursuant to the terms of the APA.   To the extent post-Closing Professional Fee Claims and post-Closing Administrative Claims that are not otherwise allocable to the Buyer under the APA exceed the $2 million wind-down budget (or the Reserves are otherwise insufficiently funded to cover Allowed Claims with higher priority than Class 3 Claims), these costs must be covered by other sources of consideration available to the Debtors, including the Unsecured Claims Funds.

As of June 30, 2012, the Debtors had consumed or incurred approximately $1.7 million of the $2 million wind-down budget provided by the Buyer.   *For further information regarding*

---

[13]   For further information regarding timing of distributions, please see the definitions of "Initial Distribution Date" and "Final Distribution Date" in Article I of the Plan.

K&E 22996029

> *anticipated use of the Wind Down Budget and risks associated with recoveries to holders of Allowed Class 3 Claims, please see Article VI.A.viii of this Disclosure Statement—Risks Affecting Potential Recoveries of Holders of Allowed Class 3 - General Unsecured Claims.*

*The Debtors believe that the Plan maximizes recoveries for holders of all Allowed Claims and strongly recommend that holders of Class 2 Secured Claims and Class 3 General Unsecured Claims vote to accept the Plan. The Debtors believe that any alternative to Confirmation of the Plan, such as a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delay, litigation, additional costs and ultimately would reduce the recoveries available under the Plan.*

### iii.    Claims Reconciliation Process and Estimated Recoveries

To facilitate timely distributions under the Plan, the Debtors intend to reconcile Claims as quickly and efficiently as possible with a goal of reconciling all Claims before the Effective Date. The Debtors expect that in connection with confirmation of the Plan, they will be able to demonstrate that the various categories of Allowed Claims are within their respective caps under the APA, thus ensuring an accurate Reserves Estimate, adequate funding of the Reserves and compliance with section 1129(a)(9) of the Bankruptcy Code.

The following table provides a summary of the current estimated amounts of total Claims and projected recoveries for both classified and unclassified Claims. **Holders of Allowed General Unsecured Claims will receive their pro rata share of Net Available Funds, which includes the $2.75 million in Unsecured Claims Funds plus any additional cash Assets that are made available to these estates**, **less any amount of Cash needed to fund Reserve shortfalls for higher priority claims.**

> *Please see Article VI.A.viii of this Disclosure Statement—Risks Affecting Potential Recoveries of Holders of Allowed Class 3 - General Unsecured Claims—for a discussion of risks to Class 3 recoveries.*

The information below is provided in summary form for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process and is qualified in its entirety by reference to the provisions of the Plan and the APA.

| Type of Claim | Estimated Total Amount | Status | Voting Rights | Expected Recovery[14] |
|---|---|---|---|---|
| Administrative Claims | $2.9 million[15] | Unimpaired | N/A | 100% |
| Professional Fee Claims | approx. $2 million | Unimpaired | N/A | 100% |
| Priority Tax Claims | < $500,000 | Unimpaired | N/A | 100% |

---

[14]    The estimated projected recoveries set forth in this table are estimates only and are therefore subject to change.

[15]    Substantially all Administrative Claims are 503(b)(9) Claims.

11

| | | | | |
|---|---|---|---|---|
| Class 1—Other Priority Claims | $0 | Unimpaired | Deemed to Accept | 100% |
| Class 2—Secured Claims[16] | Estimated-$30,000 | Impaired | Entitled to Vote | 100% |
| Class 3—General Unsecured Claims | $25-30 million | Impaired | Entitled to Vote | 9.2- 11% |
| Class 4—Interests in United Retail Group, Inc. | N/A | Impaired | Deemed to Reject | 0% |

## C.    CONFIRMATION OF THE PLAN

### i.    Requirements

The requirements for Confirmation of the Plan are set forth in section 1129 of the Bankruptcy Code.  The requirements for approval of the Disclosure Statement are set forth in section 1125 of the Bankruptcy Code.

### ii.    Confirmation Hearing

To confirm the Plan, the Bankruptcy Court must hold the Confirmation Hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing will take place in the Bankruptcy Court on **September [13], 2012 at [10:00] a.m. Eastern Time**.

### iii.    Deadline to Object to Confirmation of the Plan

Any party in interest may object to the Confirmation of the Plan and appear at the Confirmation Hearing to pursue such objection.  The Court has set **September [4], 2012 at 4:00 p.m. Eastern Time** as the deadline for filing and serving objections to the Confirmation of the Plan.  Objections to the Confirmation of the Plan must be electronically filed with the Bankruptcy Court and served on counsel to the Debtors, the U.S. Trustee and counsel to each of the Committee, the Buyer and Redcats.

### iv.    Effect of Confirmation and Consummation of the Plan

Occurrence of the Effective Date serves to make the Plan binding upon the Debtors, all holders of Claims and Interests and other parties in interest, regardless of whether they cast a Ballot to accept or reject the Plan.

### v.    Effect of Failure to Confirm the Plan

If the Plan is not confirmed by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Impaired Classes entitled to vote under the Plan that have timely

---

[16]    For further information regarding the treatment of, and the timing of distributions to be made on account of, Secured Claims, see Article III.C.ii of this Disclosure Statement.

K&E 22996029

and properly voted to accept or reject the Plan, as required by section 1126 of the Bankruptcy Code, or if any other requirements for confirmation under the Bankruptcy Code are not met, the Debtors may seek to pursue another strategy to wind down their Estates.  Other options that the Debtors may consider in the event that the Plan is not confirmed include an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and out-of-court dissolution, an assignment for the benefit of creditors, conversion to a chapter 7 cases or other strategies.

### D.    VOTING ON THE PLAN

#### i.    Impaired Claims or Interests

Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes Impaired by the Plan and receiving a payment or distribution under the Plan may vote on the Plan.  Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be Impaired if the Plan alters the legal, equitable or contractual rights of the holders of such Claims or Interests treated in such Class.  The holders of Claims not Impaired by the Plan (Class 1—Other Priority Claims; Unclassified Claims—Administrative Claims (including claims under section 503(b)(9) of the Bankruptcy Code ("*503(b)(9) Claims*"), Professional Fee Claims and Priority Tax Claims) are deemed to accept the Plan and do not have the right to vote on the Plan.  The holders of Interests that will not receive any payment or distribution or retain any property pursuant to the Plan (Class 4—Interests in United Retail Group, Inc.) are deemed to reject the Plan and do not have the right to vote.

#### ii.    Eligibility to Vote on the Plan

Unless otherwise ordered by the Bankruptcy Court, only holders of Allowed Claims in Class 2—Secured Claims and Class 3—General Unsecured Claims may vote on the Plan.

#### iii.    Voting Procedure and Voting Deadline

If you are entitled to vote on the Plan, to ensure that your vote is counted you must: (a) complete the Ballot; (b) indicate your decision either to accept or reject the Plan in the space so indicated on the Ballot; and (c) sign and return the Ballot to the address set forth on the Ballot. **BALLOTS SENT BY FACSIMILE OR ELECTRONIC MAIL WILL NOT BE ACCEPTED AND WILL NOT BE COUNTED.**  Pursuant to Bankruptcy Rule 3017, the Bankruptcy Court has ordered that original Ballots for the acceptance or rejection of the Plan must be received by the Notice and Claims Agent on or before **September [4], 2012 at 4:00 p.m. Eastern Time**.  Please refer to the website of the Debtors' Notice and Claims Agent— available at http://www.donlinrecano.com/unitedretail—for further voting procedures and rules.

#### iv.    Acceptance of the Plan

For the Plan to be accepted by an Impaired Class of Claims, holders of at least two-thirds (2/3) in amount of the Allowed Claims in such Class and more than one-half (1/2) in number of such holders must vote to accept the Plan.  In any case, at least one Impaired Class of Claims, excluding the vote of insiders, must actually vote to accept the Plan.  **YOU ARE URGED TO COMPLETE, DATE, SIGN AND PROMPTLY MAIL THE BALLOT ATTACHED TO THE NOTICE.  PLEASE BE SURE TO COMPLETE THE BALLOT PROMPTLY AND**

LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.

## II.    THE DEBTORS AND THE CHAPTER 11 CASES

### A.    THE DEBTORS' FORMER BUSINESS

As described in detail in the *Declaration of Dawn Robertson, Chief Executive Officer of United Retail Group, Inc., (I) In Support of the Debtors' Chapter 11 Petitions and First Day Pleadings and (II) Pursuant to Local Bankruptcy Rule 1007-2* [Docket No. 2] (the "*First Day Declaration*"), before selling substantially all of their assets to the Buyer,[17] an affiliate of Versa, the Debtors owned and operated a leading nationwide specialty retailer of affordable fashion for women sizes 14 & up under the AVENUE® brand name. As of the Petition Date, the Debtors operated 433 leased retail stores in 37 states and an e-commerce website at www.avenue.com. As of the Petition Date, the Debtors employed 4,422 employees, 294 of which were located at the Debtors' corporate headquarters in Rochelle Park, New Jersey or at the Debtors' distribution facility in Troy, Ohio (the "*Troy Distribution Facility*"). The Debtors employed 4,128 sales associates in their Avenue stores, 1,244 of which were full time employees.

### B.    ACQUISITION BY REDCATS

Originally conceived in 1987 when national retailer Limited Brands, Inc. combined its LERNER WOMAN store group with its SIZES UNLIMITED store group, the consolidated concept chains were spun off as an independent division in 1989 and renamed United Retail Group. Following an initial public offering in 1992, United Retail Group operated as a public company that traded on the NASDAQ under the symbol "URGI." In November 2007, Redcats USA, Inc. acquired United Retail Group through a take-private transaction with a total acquisition price of $199 million. Redcats is a web-driven, home-shopping leader with numerous successful brands in its portfolio, including The Sportsman's Guide®, The Golf Warehouse™, BrylaneHome® and the following brands sold on OneStopPlus.com®: Woman Within®, Jessica London®, Roaman's® and KingSize®.

### C.    THE DEBTORS' PREPETITION FINANCING

#### i.    The Redcats Unsecured and Secured Claims

Before November 22, 2011, Redcats funded certain of the Debtors' expenses on an unsecured basis pursuant to a cash management agreement dated August 29, 2008 (the "*Cash Management Agreement*"). The Debtors relied exclusively on cash flow from operations and parent-funding pursuant to the Cash Management Agreement to fund, among other things, payroll, trade obligations, service contracts and other daily operating expenses. The Cash Management Agreement was effectively a cash pooling arrangement that allowed Redcats to sweep positive balances in the Debtors' operating accounts on a daily basis and net the cash against amounts owed to Redcats for, among other things, loans to the Debtors and/or costs

---

[17]    Before the closing of the sale, the Buyer changed its name from Ornatus URG Acquisition, LLC to Avenue Stores, LLC.

associated with a variety of intercompany services Redcats provided to the Debtors. Thus, while Redcats largely funded the Debtors with the Debtors' own cash flow, negative balances accumulated over time, leading to an unsecured balance of approximately $48.5 million owed to Redcats as of November 22, 2011 (the "***Redcats Unsecured Claim***").

In late 2011, Redcats informed the Debtors that it was no longer willing to fund the Debtors' operations on an unsecured basis. Accordingly, on November 22, 2011, the Debtors and Redcats amended the Cash Management Agreement (including subsequent amendments, the "***Amended Cash Management Agreement***"), pursuant to which Redcats agreed to provide funding to the Debtors on a second-lien secured basis (junior to the liens held by Wells Fargo pursuant to the Redcats ABL Facility described below), with such liens attaching to the Debtors' accounts receivable, inventory, other payment intangibles and instruments. As of the Petition Date, Redcats funded or was not reimbursed for $12,521,674 in the aggregate under the Amended Cash Management Agreement (the "***Redcats Secured Claim***").

As described more fully below, in connection with entry into the APA (as defined below), the Buyer purchased the Redcats Unsecured Claim and the Redcats Secured Claim pursuant to a Claims Purchase Agreement dated February 1, 2012 (the "***Claims Purchase Agreement***").

### ii.    The Debtors' Prepetition Financing

To facilitate financing of foreign-product sourcing for many of Redcats' divisions, including the Debtors, on July 28, 2011, Redcats and certain of its affiliates, including Debtor United Retail Incorporated, as borrower, and Debtors Avenue Gift Cards, Inc. and United Retail Group, Inc., as guarantors, entered into a credit agreement with Wells Fargo Bank, N.A. ("***Wells Fargo***") and the other lenders party thereto that provides for a revolving asset-backed loan facility (the "***Redcats ABL Facility***"). The Redcats ABL Facility provides for, among other things, revolving credit with a maximum aggregate commitment of $60 million, including the issuance of letters of credit (each, an "***LOC***"). The Redcats ABL Facility is secured by, among other things, a first lien on certain current assets of Redcats and its subsidiaries, which collateral formerly included the Debtors' accounts receivable, inventory, other payment intangibles and instruments, such that the Debtors were jointly and severally liable for amounts outstanding under the Redcats ABL Facility. In connection with the financing provided by Redcats under the Amended Cash Management Agreement, Redcats and Wells Fargo entered into an intercreditor agreement memorializing Wells Fargo's and Redcats' respective first and second lien interests in the Debtors' assets.

As of the Petition Date, $11.5 million was outstanding in LOCs issued for the benefit of the Debtors under the Redcats ABL Facility, which amounts were rolled into the Debtors' $40 million debtor in possession revolving credit facility with Wells Fargo (the "***DIP Facility***") provided pursuant to the Super-Priority Senior Secured Debtor-in-Possession Credit Agreement (the "***DIP Credit Agreement***"). Following Bankruptcy Court approval of the DIP Facility, Wells Fargo released the Debtors from their obligations under the Redcats ABL Facility.

iii.        **The Debtors' Total Prepetition Indebtedness**

On the Petition Date, the Debtors had outstanding debt obligations in the aggregate amount of approximately $96.2 million comprised of (a) the $48.5 million Redcats Unsecured Claim, (b) the $12,521,674 Redcats Secured Claim, (c) $11.5 million in outstanding LOCs issued for the benefit of the Debtors under the Redcats ABL Facility, and (d) approximately $23.1 million owed to trade vendors.

D.    **THE DEBTORS' FIRST DAY MOTIONS**

On the Petition Date, the Debtors filed certain motions requesting authority to continue certain obligations in the ordinary course of business on a postpetition basis and to pay certain prepetition obligations, including: (1) use of cash management system and prepetition bank accounts [Docket No. 4]; (2) employee wages and workers' compensation obligations [Docket No. 5]; (3) critical vendor obligations relating to certain merchandise vendors, marketing services and promotional activities [Docket No. 6]; (4) obligations to lien claimants, consignment vendors and 503(b)(9) claimants [Docket No. 7]; (5) customer program obligations [Docket No. 8]; (6) credit card processing obligations [Docket No. 9]; and (7) tax obligations [Docket No. 10].   After the hearing held on February 2, 2012 (the "***First Day Hearing***"), the Bankruptcy Court granted the relief sought in these motions on either an interim or final basis. Following the hearing held on February 22, 2012, the Bankruptcy Court granted final relief with respect to the critical vendor and wages motions.

In addition to the operational relief described above, on the Petition Date, the Debtors filed a motion [Docket No. 27] to obtain approval of the DIP Facility to fund operational and other expenses during the Chapter 11 Cases until the closing of the sale of the Debtors' assets. Following the First Day Hearing, on February 3, 2012, the Bankruptcy Court entered an interim order approving the DIP Facility and authorizing the Debtors to borrow up to $25 million thereunder [Docket No. 42].   On February 23, 2012, the Bankruptcy Court entered a final order approving the DIP Facility [Docket No. 243].   The Debtors satisfied all outstanding loan obligations under the DIP Facility on April 13, 2012, the closing date for the sale of the Debtors' assets to the Buyer (the "***Closing***").

Finally, on the Petition Date, the Debtors filed the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially all of Debtors' Assets, (B) Approving the Form and Manner of Notice, (C) Scheduling an Auction and a Sale Hearing and (D) Approving Procedures for Determining Cure Amounts and (II) an Order Authorizing and Approving the Sale of Substantially all of Debtors' Assets* [Docket No. 35] (the "***Sale Motion***"), which requested approval of (a) bidding procedures for the sale of the Debtors' assets in a Court-supervised auction process, (b) the Buyer as the stalking horse bidder and bid protections in connection therewith and (c) the sale of the Debtors' assets to the Buyer or another successful bidder at an auction (the "***Sale***").   The Sale process is described in detail below.

K&E 22996029

### E.    SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

In late 2011, the Debtors, after careful review and in consultation with their advisors, determined that a chapter 11 filing, combined with an expedited operational restructuring and an efficient sale of the Debtors' assets, was the best and most expedient way to maximize the value of the Debtors' assets for their Estates and all parties in interest.  Before the Petition Date, the Debtors discussed a potential transaction with numerous parties (as discussed in detail below) before entering into the Asset Purchase Agreement (together with all exhibits, schedules, amendments and related agreements, the "**APA**") with the Buyer and Redcats.

### i.    The Debtors' Prepetition Marketing Efforts

As described in detail in the First Day Declaration and the Sale Motion, before the Petition Date, the Debtors and their advisors determined that a sale of substantially all of the Debtors' assets on a going concern basis would maximize value for their creditors and their estates and would preserve the value of their business.  In October 2011, the Debtors retained Peter J. Solomon Company, L.P. ("**PJSC**") as their financial advisor to assist the Debtors' board of directors and management team in evaluating strategic alternatives regarding a sale of the Debtors' assets.[18]

In October and November 2011, the Debtors and PJSC launched a targeted marketing and sale process for the Debtors' assets, canvassing the marketplace to identify suitable potential financial or strategic buyers to operate the Debtors' assets as a going concern.  The Debtors and PJSC also solicited bids from entities specializing in store closing and liquidation sales.  PJSC contacted or was contacted by approximately 20 potential buyers that PJSC identified as parties interested or likely to be interested in acquiring the Debtors' assets.

After further discussions, the Debtors entered into nondisclosure agreements with a number of potential buyers (both strategic and financial).  Each of the potential buyers signing a nondisclosure agreement received access to an electronic data room with confidential due diligence information on the Debtors, including projections and a business plan.  The Debtors responded to numerous information requests from potential buyers, certain of which conducted meetings with the Debtors' management.  After subsequent discussions with the Debtors and PJSC, three potential buyers submitted written proposals for the Debtors' assets.

The Debtors worked with these three potential buyers to satisfy further diligence requests and clarify proposal terms.  In late December, the Debtors focused their efforts on the only economically viable proposal, which was from Versa.  In the weeks that followed, the Debtors, Versa and Redcats negotiated and documented the APA, bidding procedures, proposed form of the sale order and numerous ancillary documents.  Negotiations among the parties were hard fought and complex.  On the Petition Date, after extensive arm's-length and good-faith negotiations, the Debtors, the Buyer and Redcats executed the APA, whereby the Buyer would

---

[18]    Cathy Leonhardt, a partner and Managing Director of PJSC, submitted three declarations in support of the sale of the Debtors' assets [Ex. E to Docket No. 35, Docket No. 209 and Docket No. 478], which are incorporated by reference herein.

serve as the stalking horse bidder for the Debtors' assets, subject to higher or better offers through an auction process and the approval of the Court.

The APA provided for the following transactions to take place:

1. The Buyer would acquire substantially all of the Debtors' inventory, the Troy Distribution Facility and leases for at least 300 of the Debtors' 433 stores;

2. The Buyer would pay (a) amounts outstanding under the DIP Facility up to $15 million (plus up to an additional $1.85 million if certain letters of credit for workers' compensation were drawn), (b) wind-down costs for the Debtors' estates up to $2 million, (c) $500,000 to holders of unsecured claims on account of such claims,[19] (d) administrative and priority claims up to $11.1 million, (e) Redcats Asia Ltd. for trade payables up to $2.2 million and (f) accounts payable that are 503(b)(9) Claims up to $4.7 million;

3. The Buyer would credit bid all or a portion of the Redcats Secured Claim;

4. The Buyer would pay all cure costs in connection with assumption of executory contracts and unexpired leases;

5. The Buyer would be obligated to replace or cash collateralize merchandise letters of credit;

6. Versa committed to capitalizing the Buyer with $13 million at closing and guaranteed certain payment obligations of the Buyer under the APA up to $35 million; and

7. Redcats would pay the Buyer $20 million in cash, prorated beginning at closing with respect to the number of leases assumed at closing (for example, if 200 leases were assumed at closing, Redcats would pay the Buyer $13,333,333 at closing and continue to make incremental payments in connection with lease assumptions until 300 leases were assumed and the full $20 million was paid to the Buyer).

    ii.    **Objections to the Bidding Procedures**

On February 22, 2012, the Bankruptcy Court held a hearing on approval of the bidding procedures. Seventeen landlords and Wells Fargo filed objections to the bidding procedures as filed with the Sale Motion. The landlords objected to, among other things, the sale objection and cure objection deadlines, the timing of cure payments and issues relating to adequate assurance that cure amounts would be paid in connection with the Sale. Wells Fargo objected to the priority granted to the break-up fee under the APA. To address the objecting parties' concerns, the Debtors amended the bidding procedures order to (a) incorporate (i) proposed dates for the

---

[19]    Pursuant to an amendment to the APA, this $500,000 amount was increased to $1,500,000, as described in detail in Article II.G below.

K&E 22996029

overbid and Auction process and related Sale Hearing (as defined herein), which conformed to the milestones required by the DIP Credit Agreement and which were discussed during the First Day Hearing and (ii) further modifications to the assumption and assignment procedures and cure notice provisions to address concerns raised by landlords regarding having adequate time to object to the sale and their proposed cure amounts, and (b) grant superpriority status to the break-up fee in an amount equal to the break-up fee, provided that such superpriority claim would be junior and subordinate only to the superpriority claim granted to Wells Fargo under the DIP Facility, and paid only to the extent the DIP obligations were paid in full. These revisions to the bidding procedures order resolved the objections of the landlords and Wells Fargo.

In addition, on February 17, 2012, the Committee filed an objection to entry of the bidding procedures order [Docket No. 189]. Among other things, the Committee objected to the proposed expedited sale process, the amount of the break-up fee and the Buyer's ability to credit bid the Redcats Secured Claim as part of the consideration for the Sale. In objecting to the credit bid, the Committee requested that the bidding procedures be modified to allow parties in interest to challenge the validity of the credit bid post-sale closing, and to require that the Buyer provide cash to the Debtors' estates in the amount of the credit bid in the event that the Redcats Secured Claim was disallowed or recharacterized as equity. On February 21, 2012, the Debtors filed their *Response to the Committee's Objection to the Debtors' Proposed Bidding Procedures Order and Bidding Procedures* [Docket No. 208]. The Debtors argued that the swift sale of the Debtors' assets was necessary and in the best interest of the creditors, that the proposed break-up fee was fair and reasonable under the Bankruptcy Code and that the Buyer's right to credit bid the Redcats Secured Claim was proper.

At the February 22, 2012 hearing (the "***Second Day Hearing***"), the Bankruptcy Court overruled the Committee's objection to the break-up fee. The parties then agreed to revise the bidding procedures order to provide that the Buyer could credit bid the Redcats Secured Claim, except to the extent the claim was reduced or disallowed by order of the Bankruptcy Court in connection with a challenge brought by a party in interest. On February 23, 2012, the Bankruptcy Court entered the *Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Substantially All of Debtors' Assets or the Liquidation of the Debtors' Merchandise (B) Approving the Stalking Horse Asset Purchase Agreement and Agency Agreement, (C) Approving the Form and Manner of Notice, (D) Scheduling an Auction and a Sale Hearing and (E) Approving Procedures for Determining Cure Amounts* [Docket No. 264] (the "***Bidding Procedures Order***").

## F.    THE DEBTORS' POSTPETITION MARKETING PROCESS

Following entry of the Bidding Procedures Order, the Debtors and PJSC again marketed the Debtors' assets to potential going-concern and liquidation bidders.

The Debtors and PJSC contacted 55 potential buyers (35 financial buyers, 18 strategic buyers and two liquidators) in addition to the 20 parties contacted before the Petition Date, to explore their interest in the Debtors' assets. Nine of these parties had contacted the Debtors or PJSC in between the Petition Date and the entry of the Bidding Procedures Order. In addition, the Debtors and PJSC contacted 15 parties who were initially contacted before the Petition Date. In connection with this process, PJSC sent a confidentiality agreement to 11 additional parties,

19

including seven financial buyers and four strategic buyers. The Debtors also sent notice of the sale to all parties required by the Bidding Procedures Order and published notice of the sale in the national edition of the *Wall Street Journal*.

To facilitate potential buyers' due diligence efforts, the Debtors and PJSC established an electronic data room containing diligence materials about the Debtors' business and operations, which materials were selected by PJSC and the Debtors' management and contained significant information about all aspects of the Debtors' operations and the proposed sale of the Debtors' assets. 17 parties (including parties that had signed confidentiality agreements before the Petition Date) ultimately executed confidentiality agreements and were given access to the diligence materials, including an updated Confidential Information Memorandum (the "*CIM*"), which PJSC prepared in consultation with the Debtors' management and which contained, among other things, a business overview of the Debtors, a profile of the Debtors' recent history and current situation and a summary of the Debtors' financial performance, explanation of such performance and a five-year financial plan with key assumptions.

The auction process set forth in the Bidding Procedures Order afforded a full and fair opportunity for any interested bidder to make a higher or otherwise better offer for the Debtors' assets than that of the Buyer. During the marketing process, PJSC responded to several parties' questions and additional diligence requests. Additionally, PJSC held numerous calls with professionals representing the Creditors' Committee to keep them fully apprised of its efforts in the sale process. PJSC also held frequent calls with the Debtors' management and independent board members with respect to the same.

The Debtors received no qualified bids other than that of the Buyer before the qualified bid deadline of March 20, 2012 at 5:00 p.m. (ET). Therefore, on March 21, 2012, the Debtors filed the *Notice of Cancellation of Auction and Selection of Successful Bidder* [Docket No. 428], where the Buyer was deemed the successful bidder, and notice was provided that no auction would be held.

## G.    COMMITTEE ADVERSARY PROCEEDING

The Bidding Procedures Order authorized, among other things, the Buyer to credit bid the Redcats Secured Claim at the Auction. On March 12, 2012, the Committee commenced an adversary proceeding [Adv. Proc. No. 12-01165] (the "***Adversary Proceeding***") pursuant to which it filed a complaint against the Buyer, seeking declaratory and injunctive relief to prohibit the Buyer from credit bidding all or any portion of the Redcats Secured Claim [Adv. Proc. Docket No. 1]. On March 15, 2012, the Debtors filed their *Response to the Motion of the Official Committee of Unsecured Creditors for a Preliminary Injunction Against the Credit Bid of Ornatus URG Acquisition, LLC and Declaratory Relief* [Adv. Proc. Docket No. 9]. In advance of an expedited hearing on March 15, 2012 on the Committee's request for a preliminary injunction, the Debtors, the Buyer, Redcats and the Committee reached a settlement of the adversary proceeding, which was memorialized in the Committee Stipulation [Adv. Proc. Docket No. 15].

Pursuant to the Committee Stipulation, the Debtors, the Committee, the Buyer and Redcats agreed (i) that the Redcats Secured Claim was an Allowed Secured Claim in the amount

of $12,521,674 and (ii) to amend the APA to (a) increase the amount of cash reserved for general unsecured creditors under the Debtors' chapter 11 plan from $500,000 to a minimum of $1.5 million,[20] (b) waive the Buyer's right to assert or receive any recovery on account of the Redcats Secured Claim and the Redcats Unsecured Claim in the event that the Buyer was the successful bidder and the Closing occurred and (c) expand the scope of the avoidance actions that were to be acquired and not pursued by the Buyer to include all avoidance actions and other causes of action that could be asserted by the Debtors' estates against the Debtors' landlords, vendors and other counterparties to assumed contracts and open purchase orders.   The terms of the Committee Stipulation were announced at the March 15, 2012 hearing and were approved by the Bankruptcy Court on March 20, 2012.

## H.     OBJECTIONS TO SALE AND CURE AMOUNTS

On March 1, 2012, the Debtors filed and served the *Notice to Counterparties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 301] (the "***Cure Notice***"), which listed the proposed cure amount for each contract and lease based upon the Debtors' books and records.  The Bidding Procedures Order provided that counterparties could object to the cure amounts scheduled in the Cure Notice and to the Sale generally on or before April 16, 2012.

As of April 16, 2012 objection deadline, the Debtors received 50 formal objections from landlords and contract counterparties asserting, among other things, that (a) the scheduled cure amounts were incorrect or did not account for accrued but unpaid or unbilled charges, (b) the Debtors had not provided adequate assurance with respect to the Buyer and/or (c) the Debtors had not provided store-closing guidelines and lease rejection procedures in connection with going-out-of-business sales for non-continuing stores.

On March 22, 2012, the Debtors filed an omnibus reply in support of the Sale Motion [Docket No. 442] (the "***Omnibus Reply***"), attached to which was a revised sale order that resolved most of the objecting parties' various concerns.   Specifically, the sale order was modified to account for unliquidated reconciliations not already included in the noticed cure amounts, and to include lease rejection procedures as well as procedures for entering into side letters modifying the store closing sale guidelines.   In the Omnibus Reply, the Debtors also proposed to schedule a separate status hearing to resolve disputed cure amounts to the extent such disputes could not be resolved consensually by the time of the sale hearing.   On April 2, 2012, the Debtors filed a further revised form of the sale order [Docket No. 487], which reflected additional changes to the sale order reflecting comments from parties in interest.

---

[20]    In connection with the Committee Stipulation, the APA was amended to provide that holders of allowed general unsecured claims would receive the greater of (a) $1.5 million and (b) 20% of the amount by which the aggregate of (i) amounts outstanding under the DIP Facility and (ii) administrative and priority claims, in each case as of the Closing, were less than $27 million.  The Debtors have estimated that $1.5 million is the greater of these two amounts.

## I.   SALE HEARING, SALE ORDER AND CLOSING

On April 3, 2012, the Bankruptcy Court held a hearing to approve the Sale. The Debtors resolved substantially all objections before the hearing, and no party raised an objection to the Sale at the hearing. Accordingly, the Bankruptcy Court approved the Sale, and on April 4, 2012, the Bankruptcy Court entered the *Order Authorizing (A) the Sale of Substantially All of the Debtors' Assets Free and Clear of All Claims, Liens, Rights, Interests and Encumbrances; (B) the Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement; and (C) the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases* [Docket No. 496] (the "**Sale Order**"). The Closing occurred on Friday, April 13, 2012.

## III.   SUMMARY OF THE PLAN

### A.   PURPOSE OF THE PLAN

The Plan provides for the distribution of the consideration provided under the APA and otherwise being contributed by Redcats to the holders of Allowed Claims.

Holders of Allowed Administrative Claims, Professional Fee Claims, Priority Tax Claims and Other Priority Claims will be paid in full in Cash (unless holders of such Claims agree to a different recovery).

Holders of Allowed Secured Claims will, at the option of the Debtors or the Plan Administrator, as applicable, be paid in full in Cash (including any interest, reasonable fees, costs or charges required to be paid pursuant to section 506(b) of the Bankruptcy Code) or receive the collateral securing any such Allowed Secured Claim (including any interest, reasonable fees, costs or charges required to be paid pursuant to section 506(b) of the Bankruptcy Code) unless holders of such Claims agree to a different recovery.[21]

**Holders of Allowed General Unsecured Claims will receive their pro rata share of Net Available Funds as soon as is practicable after the Effective Date, which includes the $2.75 million in Unsecured Claims Funds plus any additional Cash Assets that are made available to the Debtors' estates, less any Cash needed to fund Reserves for higher priority claims.[22]**

---

[21] Although the Plan treats Class 2-Secured Claims as Impaired and entitled to vote, the Debtors reserve the right to argue at the Confirmation Hearing that Class 2 is Unimpaired depending on the treatment of Class 2-Allowed Secured Claims, if any.

[22] The Debtors will make distributions to holders of Allowed Class 3 General Unsecured Claims as soon as practicable after the Effective Date, which distributions may be made on multiple distribution dates. Distributions to Class 3 creditors are subject to the following conditions under the Plan:

- No distributions will be made to holders of Allowed Class 3 General Unsecured Claims until Cash sufficient to pay all higher priority claims and Disputed General Unsecured Claims are deposited into the applicable reserves in accordance with the Plan.

Interests in United Retail Group, Inc., Intercompany Claims and Intercompany Interests will be canceled and will receive no distribution under the Plan.

***The Debtors believe that the Plan maximizes recoveries for holders of Impaired Claims and strongly recommend that holders of Impaired Claims vote to accept the Plan.  The Debtors believe that any alternative to Confirmation of the Plan, such as a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delay, litigation, additional costs and ultimately would reduce the recoveries available under the Plan.***

### B.    CLASSIFICATION OF CLAIMS AND INTERESTS UNDER THE PLAN

All Claims and Interests, except the unclassified Claims, are placed in the Classes set forth in Article III of the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims and Priority Tax Claims have not been classified.  A Claim shall be classified in a particular Class only to the extent that the Claim meets the description of Claims in that Class and shall be classified in other Classes to the extent that the Claim meets the description of such other Classes.  A Claim or Interest is also classified in a particular Class for the purposes of voting on the Plan and receiving distributions pursuant to the Plan only to the extent that such Claim or Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date.

### C.    SUMMARY OF CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

| Class | Claims | Status | Voting Rights | Expected Recoveries |
|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | Secured Claims | Impaired[23] | Entitled to Vote | 100% |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote | 9.2-11% |
| 4 | Interests in United Retail Group, Inc. | Impaired | Deemed to Reject | 0% |

---

- A final distribution will not be made until after (a) the liquidation into Cash of all remaining Assets (other than any assets abandoned by the Debtors) and collection of other sums due or otherwise remitted or returned to the Debtors, and (b) all Cash in the Reserves has been distributed or returned to the Buyer in accordance with Article V.L of the Plan.

[23]    Although the Plan treats Class 2-Secured Claims as Impaired and entitled to vote, the Debtors reserve the right to argue at the Confirmation Hearing that Class 2 is Unimpaired depending on the treatment of Class 2-Allowed Secured Claims, if any.  For further information regarding the treatment of, and the timing of distributions to be made on account of, Secured Claims, see subsection C.ii of this Article III herein.

23

i. **Class 1 – Allowed Other Priority Claims**

The Plan defines Other Priority Claims as any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

The Plan provides that except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall be paid in full in Cash on the later of (a) the Effective Date and (b) as soon as practicable after such Claim becomes an Allowed Other Priority Claim.

On the Effective Date, the Debtors shall fund the Priority Claims Reserve with Cash as described in Article VI.C of the Plan. Any amounts remaining in the Other Priority Claims Reserve after payment of all Allowed and Disputed Other Priority Claims shall be released to the Buyer in accordance with Article V.L of the Plan or, if otherwise agreed in writing by the Buyer in its sole discretion, allocated among any other Reserves as needed.

Class 1 is Unimpaired and presumed to have accepted the Plan. Class 1 is not entitled to vote on the Plan.

ii. **Class 2 – Allowed Secured Claims**

The Plan defines Secured Claims as any Claim that is secured by a valid, unavoidable lien on property in which the Estates have an interest, or that is subject to recoupment or setoff under section 553 of the Bankruptcy Code to the extent of the value of the holder's interest in the Estates interest in such property, or to the extent of the amount subject to recoupment or setoff, as determined by the Bankruptcy Court pursuant to sections 506(a), 553 and/or 1129(b)(2)(A)(i)(II) of the Bankruptcy Code, as applicable. "Secured Claim" shall not mean and does not include the Redcats Secured Claim, which shall be waived pursuant to Article II.E of the Plan.

Except to the extent that a holder of an Allowed Secured Claim has been paid by the Debtors before the Effective Date or agrees to a different recovery, at the sole option of the Debtors or the Plan Administrator, as applicable, in consultation with the Plan Oversight Representative, each holder of an Allowed Secured Claim shall receive, in full and complete satisfaction of such Allowed Secured Claim on the later of (1) the Effective Date and (2) as soon as practicable after such Claim becomes an Allowed Secured Claim: (a) Cash from the Administrative and Secured Claims Reserve in an amount equal to such Allowed Secured Claim, including any interest, reasonable fees, costs or charges on such Allowed Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (b) the collateral securing its Allowed Secured Claim, including any interest, reasonable fees, costs or charges on such Allowed Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, with any deficiency to result in an Allowed General Unsecured Claim.

On the Effective Date, the Debtors shall fund the Administrative and Secured Claims Reserve with Cash as described in Article VI.C of the Plan. Any amounts remaining in the Administrative and Secured Claims Reserve after payment of all Allowed and Disputed Secured Claims and Allowed and Disputed Administrative Claims (as described in Article II.A of the

Plan) shall be released to the Buyer in accordance with Article V.L of the Plan or, if otherwise agreed in writing by the Buyer in its sole discretion, allocated among any other Reserves as needed.

Class 2 is Impaired and entitled to vote on the Plan.

Although the Debtors expect that Class 2 Secured Claims, if any, will be fully paid in Cash on or as soon as reasonably practicable after the Effective Date (together with any interest on such claim or reasonable fees, costs or charges provided for under the agreement or state statute under which such Claim arose), Class 2 is "Impaired" under the Plan and entitled to vote because the Debtors have retained discretion under the Plan to satisfy Class 2 Secured Claims through payment of Cash or a return of collateral (with any shortfall in collateral value resulting in an unsecured deficiency claim to be treated in accordance with the treatment specified for Class 3 - General Unsecured Claims).   Pursuant to section 1124 of the Bankruptcy Code, a class of claims is "impaired" (and therefore entitled to vote on the Plan), unless, with respect to each claim of such class:

(1) the Plan leaves unaltered a creditor's legal, equitable, and contractual rights from which its claim arises; or

(2) the applicable Debtor: (i) cures certain contractual defaults that occurred before after the chapter 11 case filing; (ii) re-instates the maturity and/or interest of such claim as it existed before a default; (iii) compensates the claim holder for certain damages incurred resulting from reasonable reliance by the claim holder on certain contractual provisions or applicable law; and (iv) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interests entitles the holder of such claim or interest.

The Debtors believe that the only Secured Claims likely to constitute Allowed Class 2-Secured Claims, if any, will be claims asserted by certain taxing authorities, which may be secured by liens on certain inventory or other property that arise under applicable state or federal law.  Because the Debtors have sold substantially all of their assets in connection with the Sale, with any relevant liens attaching to the proceeds of the Sale in accordance with the provisions of the Sale Order,[24] the Debtors expect that all such claims will ultimately be satisfied in Cash (rather than through a return of any collateral) either (i) by the Buyer as tax claims are satisfied in the ordinary course pursuant to Buyer's obligations to pay post-Closing operating expenses under the APA, (ii) by the Debtors as Administrative Expenses to the extent the Debtors reach settlements with the relevant taxing authorities for pre-Closing tax audits or (iii) by the Debtors with funds allocated to the Administrative and Secured Claims Reserve.[25]  The Debtors cannot

[24]   *See* paragraph W of the Sale Order entered on April 4, 2012 [Docket No. 496], which provides that "[t]he Acquired Assets shall be transferred free and clear of all liens, claims, interests, and encumbrances with the same to attach to the proceeds."

[25]   As described in *Article VI.A.iv of this Disclosure Statement—The Reserves May Not Be Fully Funded*, the Buyer is not obligated to fund Reserves, including the Administrative and Secured Claims Reserve, in excess of the respective caps set forth in the APA.  The APA also does not require the Buyer to fund any Cash amounts for the benefit of Secured Claims and, therefore, to the extent the Debtors require Cash to satisfy holders of Class 2-Secured Claims, any such Cash will likely be funded from the $2 million Wind Down Budget.  For a

state with certainty at this time whether payment in full in Cash of all Allowed Class 2 Secured Claims will result in the claims being "unimpaired" in accordance with the requirements of section 1124 of the Bankruptcy Code and, therefore, have designated Class 2 as "Impaired" for purposes of allowing holders of such claims, if any, to vote to accept or reject the Plan.  The Debtors reserve their right to argue at the Confirmation Hearing that Class 2 is Unimpaired depending on how such claims, if any, are expected to be treated as of the Effective Date.

### iii.      Class 3 – Allowed General Unsecured Claims

The Plan defines General Unsecured Claims as any Claim that is not an Administrative Claim, a Priority Tax Claim, an Other Priority Claim, a Secured Claim, a Claim in respect of Post-Effective Date Costs or an Intercompany Claim.  "General Unsecured Claim" shall not mean and does not include the Waived Redcats Unsecured Claims, which shall be waived pursuant to Article II.E and Article II.F of the Plan, respectively.

Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share (not to exceed the amount of the Allowed General Unsecured Claim) of any Net Available Funds as of the Initial Distribution Date on the later of (a) the Initial Distribution Date and (b) as soon as practicable after such Claim becomes an Allowed General Unsecured Claim.

If after the Initial Distribution Date, any Cash is available from the liquidation of the Debtors' remaining Assets, the prosecution and enforcement of any Causes of Action, the release of funds from the Disputed Unsecured Claims Reserve or unclaimed, undeliverable or time-barred distributions to holders of Allowed Claims pursuant to Article V.C of the Plan, and in any event, becomes Net Available Funds, each holder of an Allowed General Unsecured Claim will be paid its Pro Rata share of Cash (not to exceed the amount of the Allowed General Unsecured Claim) through distributions on distribution dates to be determined by the Plan Administrator, in consultation with the Plan Oversight Representative.

Class 3 is Impaired and entitled to vote on the Plan.

No payment shall be made on account of Allowed General Unsecured Claims until Cash sufficient to pay all estimated Allowed and Disputed Administrative Claims, Secured Claims, Professional Fee Claims, Other Priority Claims and Priority Tax Claims, Post-Effective Date Costs and Disputed General Unsecured Claims in accordance with the Plan has been deposited into the applicable Reserve or the Disputed Unsecured Claims Reserve, as applicable, as the Debtors or the Plan Administrator deem necessary.

The Initial Distribution Date will be the date, as determined by the Plan Administrator, in consultation with the Plan Oversight Representative to be appointed by the Committee, when the first distribution to holders of Allowed General Unsecured Claims are made under the Plan; *provided, however*, that the Initial Distribution Date may also be the Final Distribution Date if so

further discussion of the current and expected use of the Wind Down Budget, see *Article VI.A.viii of this Disclosure Statement—Risks Affecting Potential Recoveries of Holders of Allowed Class 3 - General Unsecured Claims*.

K&E 22996029

determined by the Plan Administrator.

The Final Distribution Date will be the last date on which a final distribution of the Net Available Funds (including the Unsecured Claims Funds) and Disputed General Unsecured Claims Reserve are made to holders of Allowed General Unsecured Claims under the terms of the Plan. The Final Distribution Date shall be a date, as determined by the Plan Administrator in consultation with the Plan Oversight Representative that is after (a) the liquidation into Cash of all remaining Assets (other than any assets abandoned by the Debtors) and collection of other sums due or otherwise remitted or returned to the Debtors, and (b) all Cash in the Reserves has been distributed or returned to the Buyer in accordance with Article V.L of the Plan.

> *For further information regarding risks associated with recoveries to holders of Allowed Class 3 Claims, please see Article VI.A.viii of this Disclosure Statement—Risks Affecting Potential Recoveries of Holders of Allowed Class 3 - General Unsecured Claims.*

### iv. Class 4 – Interests in United Retail Group, Inc.

The Plan provides that on the Effective Date, all Interests in United Retail Group, Inc. shall be cancelled without any distribution.

Class 4 is Impaired and is deemed to have rejected the Plan

## D. MEANS FOR IMPLEMENTATION OF THE PLAN

### i. Effective Date

The Plan shall become effective on the first Business Day upon which all of the conditions specified in Article VI.D of the Plan have been satisfied or waived. Upon occurrence of the Effective Date, the Debtors will file with the Bankruptcy Court and post on the website of the Notice and Claims Agent a notice of confirmation and occurrence of the Effective Date. You will not receive further notice of the occurrence of the Effective Date and should monitor the Notice and Claims Agent's website—available at http://www.donlinrecano.com/unitedretail—for such notice.

### ii. Means of Implementation and Execution of the Plan

Article VI of the Plan sets forth the means by which the Plan shall be implemented and executed, including the funding of the Reserves, the duties and powers of the Plan Administrator and the dissolution of the Debtors following the Effective Date.

Pursuant to section 2.5(a) of the APA and the definition of "Assumed Liabilities" set forth therein, the Buyer is the primary source of the Cash consideration for distributions under the Plan. As described above, the Buyer has agreed to pay in Cash:

- up to $27 million in the aggregate for (1) amounts outstanding under the DIP Facility as of the Closing and (2) Administrative Claims (not including 503(b)(9) Claims, which are accounted for separately under the APA) and Priority Claims as of the Closing that ultimately are Allowed;

- up to $4.7 million for Allowed 503(b)(9) Claims;

- $1.5 million (or such greater amount as shall equal 20% of the amount by which the aggregate of (1) outstanding amounts under the DIP Facility and (2) Administrative Claims and Priority Claims, in each case as of the Closing, is less than $27 million); and

- up to $2 million for costs associated with winding down the Debtors' estates.

Pursuant to Article VI.C.2 of the Plan, before the Effective Date, the Debtors and Buyer will agree on an estimate of the maximum aggregate amount of Allowed Secured Claims, Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims and Post-Effective Date Costs (collectively, the "***Reserves Estimate***").  On the Effective Date, Buyer shall fund into the Reserves cash in an amount determined in its sole discretion that is no less than the lesser of (a) 90% of the Buyer's then remaining obligations under the APA that relate to any of the Reserves categories and (b) $100,000 (the "***Buyer Reserve Contribution***").  Pursuant to Article VI.D of the Plan, it shall be a condition to the occurrence of the Effective Date that sufficient cash to fund the Reserves in an amount no less than the Reserves Estimate shall be available, including any Buyer Reserve Contribution that the Buyer has notified the Debtors that it intends to fund, subject to the effectiveness of the Plan.

On or as soon as practicable after the Effective Date, the Plan Administrator will make distributions from the Reserves to holders of Allowed Secured Claims, Administrative Claims, Professional Fee Claims, Priority Tax Claims and Other Priority Claims.  Pursuant to Article V.L of the Plan, once the Plan Administrator has made all applicable distributions from the Reserves, any Cash remaining in the Reserves will be returned to the Buyer, together with any interest accrued thereon, unless any cash has been sourced other than from the Buyer, in which case it will be allocated pro rata in accordance with the relative contributions.

On the Effective Date, Cooley LLP will transfer the Buyer's $1.5 million contribution to the Unsecured Claims Funds to the Post-Effective Date Debtor, and Redcats will transfer the $1.25 million Redcats Unsecured Claims Contribution to the Post-Effective Date Debtor.  The Plan Administrator will make Pro Rata distributions of Net Available Funds to holders of Allowed General Unsecured Claims on the later of (a) the Initial Distribution Date and (b) as soon as practicable after such Claim becomes an Allowed General Unsecured Claim.  After the Initial Distribution Date, if any Cash is available from, among other things, the release of funds from the Disputed Unsecured Claims Reserve or unclaimed, undeliverable or time-barred distributions to holders of Allowed Claims pursuant to Article V.C of the Plan, and in any event, becomes Net Available Funds, each holder of an Allowed General Unsecured Claim will be paid its pro rata share of Cash (not to exceed the amount of the Allowed General Unsecured Claim) through distributions on distribution dates to be determined by the Plan Administrator, in consultation with the Plan Oversight Representative.

### iii.    Plan Administrator

Pursuant to Article VI.K of the Plan, on the Effective Date, a Plan Administrator shall be appointed to resolve claims, make distributions and wind down the Debtors' estates. The Plan Administrator shall be AP Services, LLC, which shall continue to perform its duties after the Effective Date consistent with the terms of employment set forth in Exhibit C to the *Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Retain AP Services, LLC to Provide the Debtors with a Wind-Down Administrator and (B) Employ Ms. Deborah Rieger-Paganis as Wind-Down Administrator* [Docket No. 551], which was approved by the Bankruptcy Court on May 17, 2012 [Docket No. 575].

As an officer of the Debtors, Ms. Rieger-Paganis is covered by the Debtors' director and officer insurance, which is provided by ACE Europe through the Debtors' ultimate parent, PPR SA. The insurance provides coverage for certain wrongful acts committed by the Debtors' directors and officers in their capacity as such, including actual, alleged or attempted breach of duty, breach of trust, breach of warranty of authority, neglect, error, omission, misstatement or misleading statement committed or attempted, or allegedly committed or attempted. Accordingly, the Debtors do not intend to purchase a bond to insure the performance of the Plan Administrator.

### iv.    Dissolution of the Committee and Appointment of Plan Oversight Representative

Pursuant to Article VI.N of the Plan, on the Effective Date, the Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities and obligations to and arising from and in connection with the Chapter 11 Cases; *provided*, *however*, that after entry of the Confirmation Order, the Committee's functions shall be restricted to, and the Committee shall not be heard on any issue except (i) applications filed by Retained Professionals, (ii) motions or litigation seeking enforcement of provisions of the Plan and the transactions contemplated hereunder or in the Confirmation Order and (iii) any pending appeals or related proceedings.

On or before the Effective Date, the Committee shall appoint a Plan Oversight Representative to monitor the claims process and distributions contemplated by the Plan. The Plan Oversight Representative shall have consultation and notice rights but shall not have the right to direct the Post Effective Date Debtor or prevent the Post Effective Date Debtor from taking any action with respect to the Plan, including the claims reconciliation process.

### v.    Cancellation of Securities and Agreements

Pursuant to Article IX.G of the Plan, on the Effective Date, except as otherwise specifically provided for in the Plan, any and all notes, securities and other instruments evidencing any Claim or Interest shall be deemed canceled without further act or action under any applicable agreement, law, regulation, order or rule.

K&E 22996029

vi.        **Substantive Consolidation**

Pursuant to Article VI.A of the Plan, the Plan shall serve as a motion by the Debtors seeking entry of an order substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation, Consummation and distributions. On and after the Effective Date, (a) all Assets and liabilities of the Debtors shall be merged so that all of the Assets of the Debtors shall be available to pay all of the liabilities under the Plan, (b) no distributions shall be made under the Plan on account of Intercompany Claims, (c) all guarantees by the Debtors of the obligations of any other Debtor shall be eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of the Debtors shall be one obligation of United Retail Group, Inc. and (d) each and every Claim filed or to be filed in the case of any of the Debtors other than United Retail Group, Inc. shall be deemed filed against United Retail Group, Inc.  If the Bankruptcy Court does not order substantive consolidation of the Debtors, nothing in the Plan or Disclosure Statement shall be deemed an admission that one of the Debtors is subject to or liable for any Claim against any other Debtor.

vii.       **Administrative Claims Bar Date**

Article II.A of the Plan provides that, unless previously filed, requests for payment of Administrative Claims that have not been paid in the ordinary course of business must be filed and served on the Debtors and their counsel before the Administrative Claims Bar Date, which shall be the date that is 45 days after the Effective Date.  Holders of Administrative Claims that do not file and serve such a request by the Administrative Claims Bar Date shall be forever barred, estopped and enjoined from asserting such Administrative Claims against the Debtors, their Estates or the Buyer, and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests must be filed by the Debtors and served on the requesting party by the later of (a) 60 days after the Effective Date and (b) 60 days after the filing of the applicable request for payment of such Administrative Claims.

Generally speaking, subject to certain exclusions set forth in the APA, the Buyer is responsible for all post-Closing expenses related to operating the Debtors' former businesses, including expenses associated with going-out-of-business sales for non-continuing stores.  Such amounts will be paid in the ordinary course of business.

viii.      **Executory Contracts and Unexpired Leases**

Article VII.A of the Plan specifies that all Executory Contracts and Unexpired Leases of the Debtors not previously assumed, rejected or terminated pursuant to section 2.6 of the APA and the Sale Order, or by order of the Court entered before the Effective Date, or which are not subject of a pending application to assume on the Effective Date, shall be deemed rejected on August 29, 2012.

**Unless otherwise provided by an order of the Bankruptcy Court, all Proofs of Claim arising from the rejection of any of the Debtors' Executory Contracts or Unexpired Leases must be filed by holders of such Claims with the Notice and Claims Agent within 30 days after service of notice of the order of the Bankruptcy Court (including the Confirmation**

30

**Order) approving any such rejection;** *provided, however,* **that the rejection claim bar date for Executory Contracts and Unexpired Leases rejected before the Confirmation Date shall be the applicable Bar Date or the date set forth in the order rejecting such lease or contract. Any holder of a Claim arising from the rejection of an Executory Contract or Unexpired Lease that does not timely file such Proof of Claim will be forever barred, estopped and enjoined from asserting such Claim against the Debtors, their Estates and property or the Buyer, unless otherwise ordered by the Bankruptcy Court and may not participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim will be deemed fully satisfied, released and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.E of the Plan.**

### E.    PROVISIONS GOVERNING DISTRIBUTIONS

#### i.    Powers of and Distributions by the Plan Administrator

Pursuant to Article V of the Plan, the Plan Administrator shall make the distributions provided for under the Plan. Pursuant to Article VI.K and VI.L of the Plan, the Plan Administrator shall be empowered to, among other things: (a) effect all actions and execute all agreements, instruments and other documents necessary to perform their its under the Plan; (b) make all distributions contemplated under the Plan (with the consent of the Buyer with respect to distributions made from the Reserves); (c) establish and maintain the Reserves; (d) employ one or more agents or personnel to assist with such distributions without further order from the Bankruptcy Court; and (e) take such other actions as may be deemed by the Plan Administrator to be necessary and proper to implement the provisions of the Plan, including objecting to and settling claims and Causes of Action.

#### ii.    Minimum Distributions

Pursuant to Article V.E of the Plan, the Plan Administrator shall not be required to make distributions or payments of less than $25.00.

#### iii.    Additional Provisions Governing Distributions

Article V.A of the Plan provides that:

- with respect to Allowed Administrative Claims, U.S. Trustee Fees, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims and Allowed Secured Claims, the Plan Administrator shall make distributions to the holders of such Claims in accordance with Article III of the Plan;

- with respect to Allowed General Unsecured Claims, the Plan Administrator shall make distributions, subject to the provisions for Disputed General Unsecured Claims set forth in Article VIII.A of the Plan, on the Initial Distribution Date and any subsequent distribution dates to the extent Net Available Funds exist subsequent to the Initial Distribution Date, until Net Available Funds have been disbursed in full; and

31

- in respect of the Final Distribution Date, the Plan Administrator is not obligated to make such a distribution if it is determined that there are insufficient Net Available Funds to make a cost-efficient distribution, taking into account the size of the distribution to be made and the number of recipients of such distribution, in which event, such funds, in the Plan Administrator's discretion, will be donated to a reputable charitable organization chosen by the Plan Administrator.

Article V of the Plan also contains provisions governing:  (a) distributions on account of Claims Allowed after the Effective Date; (b) delivery of distributions and undeliverable or unclaimed distributions; (c) compliance with tax requirements and allocations; (d) Claims paid or payable by third persons; and (e) allocation between principal and accrued interest.

F.    **PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

    i.    **Distribution Process**

Article VIII of the Plan specifies that the Plan Administrator: (a) will make no distributions on account of any Disputed Claim until such Claim becomes Allowed (but the Plan Administrator may make distributions on account of the undisputed portion of a Disputed Claim); (b) may, in its reasonable business judgment, object to any Claims and prosecute, settle, compromise, withdraw or resolve such objections; (c) may settle or compromise any Claim without further notice to or action, order, or approval of the Bankruptcy Court; and (d) may request that the Bankruptcy Court estimate any Disputed Claim pursuant to applicable law. Pursuant to Article VIII.B of the Plan, any Claim that has been paid, satisfied or superseded may be expunged from the Claims Register by the Notice and Claims Agent, and any Claim that has been amended may be adjusted on the Claims Register by the Notice and Claims Agent.

    ii.    **Claims Objection Deadline**

Any objections to Claims shall be filed no later than the Claims Objection Deadline, which shall be 120 days after the Effective Date and which may be extended for one 90 day period by the Plan Administrator by filing a notice thereof with the Bankruptcy Court, or such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court or the relevant parties for objecting to such Claims.

    iii.    **Disallowance of Claims**

Except as otherwise agreed by the Plan Administrator, any and all Proofs of Claim filed after the applicable Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim is deemed timely filed by a Final Order of the Bankruptcy Court.

    iv.    **Amendments to Claims**

On or after the Effective Date, except as otherwise provided in the Plan, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court and the Plan

32

Administrator, and any such new or amended Claim filed shall be deemed disallowed and expunged without any further notice to or action, order or approval of the Bankruptcy Court.

### G.    SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

**ARTICLE IX OF THE PLAN GOVERNS: (I) THE COMPROMISE AND SETTLEMENT OF CLAIMS, INTERESTS AND CONTROVERSIES; (II) THE RELEASE AND LIMITATION OF LIABILITY OF THE DEBTORS AND CERTAIN THIRD PARTIES, INCLUDING REDCATS; (III) RELEASES BY HOLDERS OF CLAIMS AND INTERESTS WHO VOTE TO ACCEPT THE PLAN; AND (IV) THE EXCULPATION OF CERTAIN PARTIES.  ARTICLE IX.E ALSO PROVIDES FOR A PERMANENT INJUNCTION REGARDING THESE PROVISIONS.  <u>PLEASE REVIEW ARTICLE IX AND THE PROVISIONS THEREIN CAREFULLY.</u>**

Specifically, Article IX of the Plan contains (i) releases by the Debtors of all Claims against the Released Parties and (ii) releases by the Committee, its members and each holder of a Claim that affirmatively votes to accept the Plan (collectively, the "***Releasing Parties***") of all Claims against the Released Parties.  The ***Released Parties*** are (i) subject to Bankruptcy Court approval, each of the Debtors, (ii) the Post-Effective Date Debtor, (iii) Redcats, (iv) the Committee and (v) with respect to each of (i) through (iv), such Entity's directors, officers, direct and indirect shareholders, partners, members, employees, agents, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants and other professionals or representatives when acting in any such capacities.

> *A vote to accept the Plan constitutes an acceptance and consent to the third-party release provisions set forth in Article IX of the Plan.  A vote to reject the Plan constitutes a rejection of the third-party release provisions set forth in Article IX of the Plan.*

The releases of the Released Parties by the Debtors and the Releasing Parties set forth in Article IX of the Plan are important to the success of the Debtors' Plan, which embodies the settlement and resolution of complex issues and claims and reflects significant contributions, compromises and concessions made by the Released Parties in connection with these Chapter 11 Cases, the Sale and the development of the Plan.  The Debtors believe the proposed releases are reasonable and appropriate under the circumstances and fall well within the range of reasonableness, as they are supported by ample consideration, including (i) the discharge of debt and other good and valuable consideration to be paid pursuant the Plan and (ii) the services of the Released Parties in facilitating the expeditious implementation of the Sale and the liquidation contemplated by the Plan, including (A) Redcats' contribution of $20 million to the Buyer to facilitate the Sale and (B) Redcats' further contribution of $1.25 million to the Unsecured Claims Funds and waiver of the Waived Redcats Unsecured Claims, which will significantly enhance recoveries to holders of Allowed General Unsecured Claims.  With respect to releases provided by holders of Claims, the Plan contemplates only consensual third party releases, to the extent permitted by applicable law, subject to Bankruptcy Court approval at the Confirmation Hearing.

H.    **CONDITIONS    PRECEDENT    TO    CONFIRMATION    AND CONSUMMATION OF THE PLAN**

Article VI.D of the Plan sets forth the conditions that must occur before Confirmation of the Plan and the occurrence of the Effective Date.  Article VI.E of the Plan describes the ability to waive such conditions.  Article XII.D of the Plan provides that if the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall:  (1) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any holders, or any other Entity in any respect.

I.    **MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN**

Article XII.C of the Plan provides that amendments or modifications of the Plan may be proposed in writing by the Debtors at any time before the Confirmation, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  The Debtors also reserve the right to make such modifications at or before any hearings on Confirmation as are necessary to permit the Plan to be confirmed under section 1129 of the Bankruptcy Code.

A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, provided that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims.

Article XII.D of the Plan further provides that the Debtors reserve the right to revoke or withdraw the Plan before entry of the Confirmation Order and to file subsequent chapter 11 plans.

J.    **RETENTION OF JURISDICTION**

Article X of the Plan specifies that, notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan.

IV.    **FEASIBILITY**

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.  The Plan provides for the liquidation and distribution of the Debtors' assets.  Accordingly, the

34

Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

## V.    BEST INTERESTS OF CREDITORS AND PLAN ALTERNATIVES

### A.    CHAPTER 7 LIQUIDATION

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such holder with a recovery that has a value at least equal to the value of the recovery that each such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. Accordingly, if an Impaired Class does not vote unanimously to accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7.

The Debtors believe that the Plan satisfies the best interests test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. Unsecured creditors are paid from any remaining sale proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

Substantially all of the Debtors' assets have already been liquidated through the Sale consummated by the Debtors pursuant to the Sale Order. Although the Plan effects a liquidation of the Debtors' remaining assets and a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to holders of Allowed General Unsecured Claims than would a chapter 7 liquidation. Liquidating the Debtors' Estates under the Plan likely provides holders of Allowed General Unsecured Claims with a more timely, larger recovery because of the fees and expenses which would be incurred in a chapter 7 liquidation, including the potential added time and expense incurred by the trustee and any retained professionals in familiarizing themselves with the Chapter 11 Cases.

Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

35

### B.    ALTERNATIVE PLAN(S)

The Debtors do not believe that there are any alternative plans for the reorganization of liquidation of the Debtors' Estates.  The Debtors believe that the Plan, as described herein, enables holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## VI.    RISK FACTORS

> **THE IMPLEMENTATION OF THE PLAN IS SUBJECT TO A NUMBER OF RISKS, INCLUDING THOSE ENUMERATED BELOW.  BEFORE VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE IMPAIRED AND ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT AND OTHER DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.**

### A.    CERTAIN BANKRUPTCY CONSIDERATIONS

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of votes of holders of Claims in such Impaired Classes.

#### i.    Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to pursue another strategy to wind-down the Estates, such as an alternative chapter 11 plan, a dismissal of the Chapter 11 Cases and out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 plan or other strategies.  There can be no assurance that the terms of any such alternative strategies would be similar or as favorable as those proposed in the Plan.

#### ii.    Parties in Interest May Object to the Debtors' Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification scheme under the

36

Plan complies with the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

###### iii.    The Debtors May Not Be Able to Secure Confirmation of the Plan, or Confirmation May Be Delayed

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that that Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

Confirmation of the Plan is also subject to certain conditions as described in Article VI.D of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims will receive with respect to their Allowed Claims.

###### iv.    The Reserves May Not Be Fully Funded

As described in Article III.D(ii) of this Disclosure Statement, the funding of the Reserves on or before the Effective Date is subject to the caps set forth in section 2.5(a) of the APA and the definition of "Assumed Liabilities" set forth therein.  The Buyer is not obligated to fund the Reserves in excess of such caps.  Moreover, the Buyer is only required to fund the Reserves on the Effective Date in an amount no less than the lesser of (i) 90% of the Buyer's then remaining obligations under the APA that relate to any of the Reserves categories and (ii) $100,000.  Finally, the Buyer has no obligation to fund any amounts in excess of amounts required to be paid by the Buyer pursuant to the APA.  Accordingly, there can be no assurance that the Reserves will be funded in an amount sufficient to make distributions to all holders of Allowed Claims to be paid from such Reserves.

###### v.    Nonconsensual Confirmation—Cramdown

In the event that any impaired class of claims or interests does not accept (by voting to reject or being deemed to reject) a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (without including the votes of insiders), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Although the Debtors believe that the Plan will meet such tests, the Debtors cannot be certain that the Bankruptcy Court would reach the same conclusion.

K&E 22996029

vi.    **Parties May Object to the Amount or Classification of a Claim**

Except as otherwise provided in the Plan, parties reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates contained in the Plan and this Disclosure Statement cannot be relied on by any holder of a Claim where such Claim is subject to an objection or is not yet Allowed.  Any holder of a Claim that is subject to an objection may not receive its expected share of the estimated distributions described in the Plan and this Disclosure Statement unless and until the objection is resolved and the Claim is Allowed.

vii.    **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

viii.    **Risks Affecting Potential Recoveries of Holders of Allowed Class 3 - General Unsecured Claims**

Although the Debtors have estimated a 9.2-11% recovery for holders of Allowed Class 3 Claims, the Debtors cannot state with certainty what recovery will ultimately be available to holders of Claims in Class 3.  Although the Plan contemplates that $2.75 million of Unsecured Claims Funds will be distributed to holders of Allowed Class 3 General Unsecured Claims (subject to increase on the Effective Date as set forth herein), the Debtors cannot unequivocally state, at this time, the aggregate amount of Claims in Class 3 that will ultimately be Allowed or whether certain funds currently designated for distribution to Class 3 will need to be allocated to shortfalls in the Reserves for Claims with higher priority and first right to payment under the Bankruptcy Code.

*As described in Article I.B.ii above*, the Debtors are operating under a limited $2 million wind-down budget pursuant to the terms of the APA, which amount represents the total funds available to cover all post-Closing Allowed Professional Fee Claims and post-Closing Allowed Administrative Claims not otherwise allocable to the Buyer under the APA, including expenses associated with winding down the Debtors' estates both before and after the Effective Date.  To the extent these costs exceed the $2 million wind-down budget (or the Reserves are otherwise insufficiently funded to cover Allowed Claims with higher priority than Class 3 Claims), these costs must be covered by other sources of consideration available to the Debtors, including the Unsecured Claims Funds.

As of June 30, 2012, the Debtors have consumed or incurred approximately $1.7 million of the $2 million wind-down budget provided by the Buyer.  Although the Debtors believe they have completed the lion's share of the work required to confirm a liquidating plan and wind down these estates — and that the continued spend by Professionals will be limited going forward — it is possible that the entire wind-down budget could be fully exhausted before the Effective Date.

Specifically, both before and after the Effective Date, the Debtors must complete a number of tasks to fully wind-down their estates, including:

38

- soliciting and tabulating votes on the Plan and preparing for the Confirmation Hearing and the Effective Date;

- preparing required filings for the Bankruptcy Court such as monthly operating reports;

- reconciling and objecting to Claims;

- winding down and dissolving the Debtors' legal entities;

- completing certain employee transition matters, such as the termination of the Debtors' 401(k) plan and the transfer of continuing participants in that plan to the Buyer's plans; and

- cooperating with Redcats to address tax returns and other tax matters.

There are reasons to believe, however, that to the extent Administrative Claims or Professional Fee Claims exceed the $2 million wind-down budget, such claims will have a minimal, if any, impact on the estimated recoveries for holders of Class 3 Claims.

- *First*, certain of the wind-down tasks listed above are being performed by other parties at no cost to the Debtors.  For example, the Buyer's employees are performing the vast majority of the claims reconciliation work, and Redcats performs the vast majority of the tax work.

- *Second*, the Debtors' estimate of $25-30 million for the Class 3 Claims pool is conservative, and such estimate includes $12.5 million in estimated rejection damage claims, equal to the average annual rent at 100 of the Debtors' former stores.  The Debtors believe that actual rejection damages claims ultimately may be less than $12.5 million.  Moreover, the Debtors and their Professionals will only incur administrative expenses on reconciling or objecting to claims where the expected benefits of doing so will exceed the costs.  Put another way, the Debtors will not spend a dollar to save pennies for unsecured creditors with bona fide claims.

- *Third*, certain of the Debtors' professionals hold retainers in the aggregate of more than $300,000, which retainers will be applied to Professional Fee Claims to augment the wind-down budget.

- *Fourth*, pursuant to the Committee Stipulation, to the extent the $27 million combined cap for amounts outstanding under the DIP Facility and Administrative and Priority Claims ultimately is less than $19.5 million, the Buyer is required to increase its contribution to the Unsecured Claims Funds, such that its total contribution is equal to 20% of the difference between $27 million and the aggregate amount of amounts outstanding under the DIP Facility and Administrative and Priority Claims.  This calculation may ultimately yield additional recoveries to Class 3 creditors.

***While the Debtors cannot project with certainty the ultimate recoveries for holders of Class 3 Claims, the Debtors believe that the Plan maximizes recoveries for holders of all***

*Allowed Claims and strongly recommend that holders of Impaired Claims vote to accept the Plan. The Debtors believe that any alternative to Confirmation of the Plan, such as a conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delay, litigation, additional costs and ultimately would reduce the recoveries available under the Plan.*

### B. RISKS ASSOCIATED WITH INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT

#### i. Information Contained Herein is for Soliciting Votes

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

#### ii. No Legal or Tax Advice is Provided to You by this Disclosure Statement

*This Disclosure Statement is not legal advice to you.* The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or an Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

#### iii. No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests or any other parties in interest.

#### iv. Failure to Identify Claims or Projected Objections

No reliance should be placed on the fact that a particular Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors or the Plan Administrator may seek to object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to such Claims.

#### v. Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Professionals

The Professionals retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although Professionals retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

40

vi.        **Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Debtors have used their reasonable business judgment to ensure that accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

vii.        **No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Debtors, counsel to the Committee and the U.S. Trustee.

C.        **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

If the Plan is not confirmed, the alternatives include (a) continuation of the Chapter 11 Cases and formulation of an alternative chapter 11 plan or plans or (b) liquidation of the Debtors under chapter 7 of the Bankruptcy Code. A discussion of these alternatives is set forth in Article V herein, "Best Interests of Creditors and Plan Alternatives."

VII.    **TAX CONSEQUENCES OF THE PLAN**

THE DEBTORS HAVE NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE OR AN OPINION OF COUNSEL WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN. THUS, NO ASSURANCE CAN BE GIVEN AS TO THE TAX CONSEQUENCES OF THE PLAN. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

K&E 22996029

## VIII.   CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all holders of Claims and Interests and urge all holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Notice and Claims Agent no later than **September [4], 2012 at 4:00 p.m. Eastern Time**.

Dated:  July [23], 2012                                  Respectfully submitted,


                                                         UNITED RETAIL GROUP, INC.
                                                         On behalf of itself and the other Debtors

                                                         By:      /s/ Deborah Rieger-Paganis
                                                         Name:   Deborah Rieger-Paganis
                                                         Title:     Wind-down Administrator

K&E 22996029

## **EXHIBIT A**

**Debtors' Joint Plan of Liquidation Pursuant to
Chapter 11 of the Bankruptcy Code**